FLANSBURG v. NEW YORK CONTRACTING CO., PENNSYLVANIA
TERMINAL.

(Supreme Court, Appellate Division, First Department.   February 4, 1910.)

MASTER AND SERVANT (§§ 265, 278*)—INJURY TO SERVANT—NEGLIGENCE—EVI-
DENCE.

Evidence, in an action for injury to an employé in a tunnel, from the
derailment of his master's train used to haul the excavated material, that
the track was laid on cinders, had been in use for from six months to a
year, and was straight and level at that point, and that the train was
going only seven miles an hour, that in the same locality derailments had
been frequent, one occurring there a week before from the spreading of
the rails, when more ashes were put under the ties and the rails again
spiked to them, in connection with testimony of a witness for defendant,
who saw the rails after the accident, suggestive of the accident having
been caused by the spreading of the rails, justified the jury in assigning
the cause of the accident to the defective condition of the roadbed and
defendant's negligence, though the rule of res ipsa loquitur does not apply,
because the accident may have been due to other causes; the possibility
of other causes, such as the shifting of the load or the falling of a rock
from a car, not requiring plaintiff to absolutely negative them.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 881,
954–972; Dec. Dig. §§ 265, 278.*]

Ingraham, P. J., and McLaughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by Charles Flansburg against the New York Contracting
Company, Pennsylvania Terminal. From an order setting aside a
verdict and granting a motion to dismiss the complaint, made at the
close of the evidence, on which the court reserved action till the com-
ing in of the verdict, plaintiff appeals. Modified and affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, MILLER,
McLAUGHLIN, and DOWLING, JJ.

Thomas J. O'Neill, for appellant.
John C. Toole, for respondent.

MILLER, J.   The plaintiff was employed as a brakeman on one of
the defendant's work trains in the Pennsylvania Terminal excavation
between Seventh and Tenth avenues and Thirty-First and Thirty-
Third streets, in the borough of Manhattan.   These trains were used
to haul the excavated material to the dock on the river.   For that
purpose, an excavation was made for two main tracks, running east
and west, and from the main tracks there were side lines running to
the derricks and shovels.   While it is claimed by the defendant that
the main tracks were frequently changed, they are referred to by one
of the defendant's witnesses as permanent, and there is testimony
that they had been in use for from six months to a year before the
accident.   The side tracks were shifted frequently.   Thirty loaded
trains a day went over the main tracks.   A loaded train of 17 cars,
with engines ahead and behind, was proceeding west on the main
track at about seven miles an hour, when some of the cars left the
track, the train buckled, and the plaintiff was caught between the rear

car and the engine; sustaining the injuries for which he seeks to recover.

At the place of the derailment the track was level and straight. While there is some dispute as to the exact spot of the derailment, all agreed that it occurred in the vicinity of Eighth avenue, and there is abundance of evidence to show that derailments frequently occurred on that track in that locality. The plaintiff testified that, a week before the accident, there was a derailment there, caused by the spreading of the rails; that more ashes were put under the ties, and the rails spiked to them again. While he undertook to testify that the rails spread at the time of the accident in question, at the best, that testimony could only have been based on inference, as he admits that he was rendered unconscious by the accident. A witness called by the plaintiff testified:

"Once in a while I have seen them go off in that locality. * * * I have seen trains derailed before this, in this cut; might be 50 to 100 feet, 200 feet away, on that same piece of line, or a couple of hundred feet away, some of them 50 feet away. Yes; they are liable to go off; they undoubtedly went off."

The defendant's yardmaster, called by it, testified:

"Q. How often before this accident did the cars leave the track when west bound, immediately in the neighborhood of Eighth avenue? A. Might be a couple of days without it. Q. A couple of days without them going off? A. Yes, sir. Q. But every couple of days they would go off? A. Maybe a week sometimes. Q. But every couple of days or a week they would go off? A. Every couple of days they would. Q. Every couple of days or week; you said first a couple of days? A. What do you mean, the side tracks or the main tracks? Q. The main tracks. A. Might go a month or six months on the main track without going off. Q. I am not asking about what it might do. What did they do? A. We have had them there three years, and they have not been off on parts of the main tracks."

He also admitted seeing the track foreman measuring the tracks at the place of the accident with a track gauge; and, in view of his confused and contradictory statements on that subject, the inference is fairly justified that the gauge was thus being used after the accident, and because of repairs made necessary by it. The track foreman was not called as a witness by the defendant. The one witness, called by the defendant, who could distinctly testify that he made an examination of the tracks after the accident was the day superintendent. He testified:

"I made an examination of the track. The track gang came, and we placed the cars back on the track, and there may have been some minor repairs, such as the wheels of the cars may have been loosened up, a rail or something, and they fixed it at the time, and the train went on up."

The plaintiff testified that, during the week preceding the accident, the cars rocked sideways and up and down, and that the tracks were laid on a bank of ashes and cinders three or four feet high. He is to some extent corroborated by an apparently unwilling witness, who admitted that the ties were laid on ashes. The defendant's evidence is to the effect that the ties were laid on the solid rock, and that the cinders were used for tamping.

It is suggested by the testimony of witnesses for the defendant that the derailment may have been due to the shifting of the load on a

car, or to a rock falling from a car upon the track. Where a train moving at the rate of seven miles an hour is derailed on a straight, level track, but little evidence is needed to point to a defective condition of the tracks as the cause of the accident. That evidence was supplied by proof of frequent similar prior occurrences, some of them shown to have been due to a spreading of the rails. While I think that the weight of the evidence shows that the ties were laid on rock and tamped with cinders, the plaintiff's evidence presented a question for the jury whether the tracks were not laid on a bank of ashes and cinders three or four feet high, and a jury would certainly be justified in saying that that was not a safe method of track construction. It may be that there is no direct and positive testimony that the rails spread at the time of this accident; but the testimony of the only witness, produced by the defendant, who distinctly swears that he saw the tracks after the accident, is at least suggestive of that as the cause; and, when considered in connection with the circumstances of the accident and the prior occurrences, I think justifies the inference that in fact the rails did spread, thereby causing the accident.

Of course, the defendant was not obliged to furnish such a roadbed as would be needed for heavy trains running at high speed; but it was obliged to use reasonable care to provide a reasonably safe place for its men to work, and it seems to me that reasonable care would have prevented the almost daily derailment of its trains. The fact of the derailment where the roadbed was defective justified the jury in assigning the cause of the derailment to the defective condition of the roadbed. The rule "res ipsa loquitur" does not apply, for the reason that the happening may have been due to causes other than the defendant's negligence—e. g., the shifting of the load or the falling of a rock from a car onto the tracks; but the possibility of such other causes did not require the plaintiff to absolutely negative them. I think the evidence presented a fair question of fact as to whether the defendant's negligence was the cause of the accident.

The question of the plaintiff's assumption of risk was not submitted to the jury, although it was an important element for consideration. In view of that and other circumstances, not necessary to comment upon, I think the order appealed from should be modified, by striking out the provision dismissing the complaint, by directing a new trial, and, as thus modified, affirmed.

Order modified, as stated in opinion, and, as modified, affirmed, without costs.

LAUGHLIN and DOWLING, JJ., concur.

McLAUGHLIN, J. (dissenting). The evidence did not, in my opinion, justify a finding that the accident was due to the negligence of the defendant; nor was it of such probative force as justified an inference that the cars were derailed by the spreading of the tracks. One might guess the accident was caused in that way; but whether it was, or not, is a matter of pure speculation. Before a plaintiff is entitled to recover damages for an injury sustained on account of a

defendant's negligence, evidence must be produced from which the cause of the accident can be determined with a fair and reasonable degree of certainty, and also that such cause was due to some negligent act, either of commission or omission, on the part of the defendant. Here the cause of the accident is not disclosed, nor is there anything to indicate in what respect the defendant failed to perform its duty or obligation to the plaintiff.

For these reasons, I dissent from the prevailing opinion, and vote to affirm the order without modification.

INGRAHAM, P. J., concurs.